1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF RHODE ISLAND

3

4        * * * * * * * * * * * * * * *      C.R. NO. 04-100ML
                                        *
5                                       *
     UNITED STATES OF AMERICA           *
6                                       *
         VS.                            *    SEPTEMBER 19, 2005
7                                       *    10:00 A.M.
     JOEL FRANCISCO                      *
8                                       *
     * * * * * * * * * * * * * * *      PROVIDENCE, RI
9

10             BEFORE THE HONORABLE MARY M. LISI,

11                      DISTRICT JUDGE

12
                         (Sentencing)
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:     MARY E. ROGERS, ESQ.
                             STEPHEN G. DAMBRUCH, ESQ.
16                           U.S. Attorney's Office
                             50 Kennedy Plaza
17                           Providence, RI   02903

18   FOR THE DEFENDANT:      DAMON D'AMBROSIO, ESQ.
                             160 Plainfield Street
19                           Providence, RI   02909

20   Court Reporter:         Karen M. Zinni, RPR-RMR-CRR
                             One Exchange Terrace
21                           Providence, RI   02903

22

23
          Proceeding reported and produced by computer-aided
24                         stenography

25

ORIGINAL  51

1                          I N D E X

2    **GOVERNMENT WITNESS**                              **PAGE**

3    <u>Robert Enright</u>
     Direct Examination by Ms. Rogers              21
4    Cross-Examination by Mr. D'Ambrosio           30
     Redirect Examination by Ms. Rogers            38

5

6

7

8                        E X H I B I T S

9    **GOVERNMENT**                    **FOR ID**        **IN FULL**
          1                                               24

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        19 SEPTEMBER 2005 -- 10:00 A.M.

2            THE COURT:  This is the matter of the United

3        States versus Joel Francisco.  The matter is before the

4        Court this morning for imposition of sentence.

5            The probation officer has completed the

6        pre-sentence report and has done both a guidelines

7        calculation and also a recommendation with respect to

8        the statutorily required sentence to be imposed in this

9        case and that is of life imprisonment with respect to

10       Count II.  As to Count III -- Count I, rather, the

11       guideline range is 360 months to life in prison.

12           I know that the Defendant, through counsel, has

13       made certain objections to the pre-sentence report; and

14       I'll ask you, Mr. D'Ambrosio, whether in view of the

15       statutorily required sentence in this case you're

16       pressing those objections this morning.

17           MR. D'AMBROSIO:  I am, your Honor.

18           THE COURT:  Okay.  Have you had an opportunity

19       to review the pre-sentence report with your client?

20           MR. D'AMBROSIO:  I have, your Honor.

21           THE COURT:  Okay.  Before I address your

22       objections, Ms. Rogers, have you had an opportunity to

23       review the pre-sentence report?

24           MS. ROGERS:  Yes, your Honor.

25           THE COURT:  I received this morning the

1    Government's response to the Defendant's objections.

2    Mr. D'Ambrosio, have you had an opportunity to review

3    the Government's response?

4         MR. D'AMBROSIO:  I have not, your Honor.

5         THE COURT:  You have not?

6         MR. D'AMBROSIO:  I have not.

7         THE COURT:  Well, do you have it?

8         MR. D'AMBROSIO:  No, I don't.

9         THE COURT:  You mailed it on Friday?

10        MS. ROGERS:  Yes, your Honor.

11        MR. D'AMBROSIO:  My office doesn't receive mail

12   on Saturdays, Judge.

13        THE COURT:  Well, why don't you give him a copy,

14   and we'll recess for a half hour so you can read it.

15        MR. D'AMBROSIO:  Your Honor, may I be heard on

16   one other matter?  I'm speaking particularly of the

17   lateness of this proceeding.

18        The Court will note within the parameters of the

19   Defendant's objections to the pre-sentence report I

20   have referenced a certain post-conviction application

21   being made on each of the predicate offenses which give

22   rise to this.

23        These matters came on in the Superior Court last

24   Wednesday and Thursday on the state's motion to dismiss

25   each of those.  Both of those motions to dismiss were

1    denied, and they are presently scheduled for decision

2    on September 30th before Magistrate McAtee.  I found

3    this out Thursday afternoon.

4         Again, due to the lateness of it, I haven't had

5    time to file a written request; but I would be moving

6    for a continuance if the Court would entertain it.

7         THE COURT:  Why didn't you just call us,

8    Mr. D'Ambrosio?

9         MR. D'AMBROSIO:  Judge, I thought because of the

10   lateness of the --

11        THE COURT:  Pick up the telephone and call

12   somebody.

13        MR. D'AMBROSIO:  Yes, Judge.

14        THE COURT:  You've got all these people in here

15   today.  You've got your client here, the Government

16   here and the Court.

17        MR. D'AMBROSIO:  Yes, your Honor.

18        THE COURT:  It's a waste of everybody's time,

19   isn't it?

20        MR. D'AMBROSIO:  I think it would be dependent

21   upon the Court's ruling on the motion.  It may be,

22   Judge.  I apologize, but I thought it would be more

23   appropriately addressed to the Court here.  It was a

24   bad error of judgment on my part.  I'll accept that

25   responsibility, your Honor.

```
 1              THE COURT:  What motion is it that's pending in
 2     state court?  You had requested a continuance from this
 3     court, which I gave you.
 4              MR. D'AMBROSIO:  That is correct, your Honor.
 5              THE COURT:  What motion is pending?
 6              MR. D'AMBROSIO:  There are two applications for
 7     post-conviction relief.  They are pending before
 8     Magistrate McAtee for a decision and review of the
 9     transcript on September 30th.
10              THE COURT:  What relief are you asking for in
11     state court?
12              MR. D'AMBROSIO:  That each of the convictions,
13     sentences in those cases be vacated and the matters be
14     reassigned for either pretrial conference or trial.
15              THE COURT:  Did he serve sentences on those
16     cases?
17              MR. D'AMBROSIO:  Yes, Judge.  Well, sentence was
18     imposed.
19              THE COURT:  Were they convictions after a trial
20     or upon a guilty plea?
21              MR. D'AMBROSIO:  Each was upon a plea of nolo
22     contendere in state court.
23              THE COURT:  Were they counselled pleas?
24              MR. D'AMBROSIO:  Yes, they were, your Honor.
25              THE COURT:  Approach.  Barry.
```

1     (Bench conference held on the record)

2     THE COURT:  Tell me again procedurally what the

3 state filed on those cases.

4     MR. D'AMBROSIO:  The state, per its counsel,

5 filed a motion to dismiss the Petitioner's application

6 for post-conviction relief seeking to vacate the

7 judgment and sentence imposed on each of those cases.

8 Each was a simple possession charge.

9     THE COURT:  A simple possession?

10     MR. D'AMBROSIO:  A simple possession charge.

11 Those are the two predicate offenses here.

12     THE COURT:  And so tell me what happened with

13 the state's motion.

14     MR. D'AMBROSIO:  The state's motion, the state

15 actually withdrew its motion, so it was not being

16 pressed, and the matter's been assigned for decision.

17     THE COURT:  Oh, that's different.  Then it

18 wasn't dismissed by the Court.  You told me that the

19 Court dismissed the motion.

20     MR. DAMBRUCH:  I spoke to Assistant Attorney

21 General Stacey Veroni who is representing the State of

22 Rhode Island in that matter, and my understanding is

23 that the motion to dismiss was filed based upon the

24 fact that Defendant had not filed appropriate paperwork

25 to pursue these proceedings.

1        The Defendant was given some additional time by

2   the Court, still hadn't filed the paperwork, so the

3   motion was set down for hearing.  Apparently now

4   Mr. D'Ambrosio has satisfied the requirement of just

5   filing the appropriate paperwork.  This was not a

6   motion based upon the merits.

7        Furthermore, in speaking to Miss Veroni, she

8   advised me the Defendant was counselled on both of

9   these pleas, I believe.  It was by Attorney David

10  Cooper.

11       MR. D'AMBROSIO:  That's correct.

12       MR. DAMBRUCH:  He's private counsel.  These

13  things happened some time ago.  There's been no

14  complaint with regard to the sufficiency of the

15  evidence or the voluntary and knowing nature of the

16  plea up until the point that he's now convicted; and

17  because he's facing a life sentence, he wants to

18  relitigate these matters.

19       So any delay that has occurred with the

20  post-conviction relief I would argue is directly

21  attributable to the Defendant in that he failed to --

22  first, waited a whole lot of time before moving at all

23  and then, secondly, failed to file the appropriate

24  paperwork until the state basically forced his hand by

25  way of a motion to dismiss.

1          THE COURT:  Barry, tell me where in the report

2     you talk about the statutory penalty.  Is it referenced

3     in any of the body of the report?

4          THE PROBATION OFFICER:  It should be on that

5     page I believe you're looking at now, Judge.

6          THE COURT:  Those are the enhanced penalties.

7     Is it based on him having two prior drug trafficking

8     offenses?

9          THE PROBATION OFFICER:  It's based on the motion

10    that the Government filed for this case.

11         MR. DAMBRUCH:  The statute requires two prior

12    felony drug convictions, and the Government filed an

13    851 Information, your Honor, citing to and including

14    certified copies of those convictions in support of its

15    position.

16         THE COURT:  Okay.  Tell me which ones they are.

17         MR. DAMBRUCH:  If I may have a moment, we have

18    the document here.

19         (Pause)

20         MR. DAMBRUCH:  Your Honor, the two convictions

21    at issue are the February 4, 1998, conviction for

22    possession of cocaine.

23         THE COURT:  Just a minute.

24         MR. DAMBRUCH:  Which is on page 8 of the report,

25    your Honor.

1    THE COURT:  Was it simple possession?

2    MR. DAMBRUCH:  It was, your Honor, yes.

3    THE COURT:  And that counts?

4    MR. DAMBRUCH:  It does, your Honor.  The statute

5    requires conviction for a prior felony drug offense.

6    It does not require that there be any involvement of

7    distribution.

8    THE COURT:  Okay.

9    MR. DAMBRUCH:  The second conviction follows

10   immediately after on page 8.  It's --

11   THE COURT:  Paragraph 33?

12   MR. DAMBRUCH:  That's correct, your Honor, yes.

13   Those are two separate cases that were disposed of

14   before the Superior Court.

15   THE COURT:  Okay.  And this is by virtue of

16   Section 851?

17   MR. DAMBRUCH:  By virtue of Section 851 is the

18   section that allows us to move, and then the language

19   with regard to the prior felony drug conviction is

20   841(a)(1) and (b)(1)(A).

21   THE COURT:  So he pled out on those, he was

22   represented by counsel, he served the sentence and you

23   have a motion for what?

24   MR. D'AMBROSIO:  An application for

25   post-conviction relief under the Rhode Island General

1      Laws.  Essentially both of the cases have probable

2      cause issues, I would say.  That's the sum and

3      substance of each of the cases.

4           In one case he was stopped on the street corner,

5      told to raise his hands without any wrongdoing.  In

6      another he was taken out of the passenger side of a

7      vehicle, patted down.  Apparently it was -- I'm trying

8      to recall if it was a hard object in his pocket, and

9      another bag of cocaine was found.

10          THE COURT:  I don't know whether the state court

11     is going to grant you the relief you're asking for.

12     You're telling me the state is opposing the motion on

13     the merits?

14          MR. DAMBRUCH:  Absolutely, your Honor.  These

15     were counselled pleas that occurred in 1998.

16          THE COURT:  Okay.  All right.  I'm going to deny

17     your request for a continuance today.  It seems to me

18     that you can bring these proceedings on a parallel

19     vein.  I'll impose sentence today.

20          You've got a year from today, I think, to come

21     back and file a motion in this case if you're

22     successful over there; but I think to put this off any

23     longer, I've already given you -- didn't I give you

24     about 60 days or so?

25          MR. D'AMBROSIO:  You did, your Honor.  That's

1    why I thought the Court would rule in this fashion.

2         THE COURT:  But, seriously, if you're going to

3    ask for a continuance, don't bring all these people in

4    here.  I would have been more inclined to give you a

5    couple of weeks if you had called in on Thursday and

6    told us what the story was.

7         MR. D'AMBROSIO:  Your Honor, may I ask one other

8    thing?  The Court has given me some time to look at the

9    Government's response, and I'm grateful.  Speaking with

10   the Government today, I believe the Government may be

11   looking toward going into evidence.  I was not aware

12   this was going to be an evidentiary hearing today.

13        THE COURT:  Well, you're objecting to two parts

14   of the pre-sentence report, one, his gang affiliation

15   and, two, obstruction and, three, I guess, the third is

16   whether or not he was a leader.

17        The gang affiliation doesn't affect the

18   guidelines computation, but whether or not he was a

19   leader and whether or not he obstructed justice

20   certainly affects the guidelines computation.  So it

21   seems to me the only way they can prove that is to put

22   evidence in.

23        MR. D'AMBROSIO:  Okay.  That's fine.  I just

24   wasn't --

25        THE COURT:  So why don't you take a few minutes

1     and read the Government's objection to or response to

2     your objections, and then I'll come out and continue

3     this.

4          MR. DAMBRUCH:  Thank you, Judge.

5          (End of bench conference)

6          (Recess)

7          THE COURT:  Mr. D'Ambrosio, have you now had an

8     opportunity to review the Government's response to your

9     objections to the pre-sentence report?

10         MR. D'AMBROSIO:  I have, your Honor.  Thank you.

11         THE COURT:  And you're prepared to go forward?

12         MR. D'AMBROSIO:  Yes, your Honor please.

13         THE COURT:  I'll take up each of your objections

14    in order.

15         MR. D'AMBROSIO:  Yes, your Honor.

16         THE COURT:  Would you come up to the podium,

17    please.  The first objection that you have really does

18    not affect the guidelines calculation.

19         MR. D'AMBROSIO:  That's correct, Judge.

20         THE COURT:  And so -- and the Government's

21    response indicates that there are three other

22    Indictments pending against this Defendant, and so the

23    probation officer correctly wrote that there are

24    pending or, rather, related cases.

25         Your second objection relates to a statement in

1      the prosecution version.

2             MR. D'AMBROSIO:  That is correct.

3             THE COURT:  Are you pressing that objection?

4             MR. D'AMBROSIO:  Yes, your Honor please.

5             THE COURT:  Okay.  And, Ms. Rogers, is this one

6      of the matters that you're prepared to present evidence

7      on this morning?

8             MS. ROGERS:  Yes, your Honor.

9             THE COURT:  Okay.  We'll hold that, then,

10     pending the Government's opportunity to present

11     evidence.  My recollection, Mr. D'Ambrosio, is that the

12     Government purposefully withheld that evidence during

13     trial because it was more prejudicial than probative in

14     that particular case.

15            Your third objection relates to paragraph number

16     12, and that one I guess the Government also is

17     intending to offer evidence on.  Is that right,

18     Ms. Rogers?

19            MS. ROGERS:  Your Honor, I have gone over this

20     with the officer who testified as well as the assisting

21     detective during the trial, and that evidence was

22     presented during the trial.  We're prepared to offer it

23     again but in order to initially save time offer or ask

24     the Court to take judicial notice of the record.

25            THE COURT:  Well, do you have a copy?  This case

1  was tried so long ago, I honestly don't have a

2  recollection of what that testimony was.  Do you have a

3  transcript?

4      MS. ROGERS:  No, your Honor.  Then we'll simply

5  put the officer on the stand.

6      THE COURT:  Then you're going to have to put him

7  on.  And your next one, you object to the four-level

8  increase at paragraph number 17 for an aggravating role

9  in the offense, and I take it that the Government has

10  or is intending to put evidence on to that effect as

11  well.

12      MS. ROGERS:  Yes, your Honor.  Also, the

13  Government would be asking at the time that the Court

14  take judicial notice of -- there's actually five cases,

15  three in which the Defendant is named.  All of these

16  have been before this Court and have either pled guilty

17  and been sentenced or at least pled guilty.

18      There are two other cases, I've got copies of

19  everything, I've provided the Defendant with copies of

20  these Informations and Indictments, where the Defendant

21  is an unindicted co-conspirator; and we would be

22  offering or asking that the Court take judicial notice

23  of those as well, where he directs at least five other

24  individuals, and present the police officer's testimony

25  to that effect.

1      MR. D'AMBROSIO:  Well, I would object to that.

2   I don't know what the evidentiary value of an

3   Indictment is, your Honor.  It's hard to say.  I don't

4   know what was presented.

5      THE COURT:  Well, I'm concerned about just

6   offering up an Indictment where he's named as an

7   unindicted co-conspirator, Ms. Rogers.  It seems to me

8   that you've got to have some factual support for the

9   contention; and there's plenty, I think, available to

10   the Government.  I've heard the guilty pleas of a

11   number of the Defendant's co-conspirators.  And so it

12   seems to me that you've got plenty out there without

13   having to go to the Indictments that I haven't heard

14   about.

15      And as a result, you're claiming that his

16   offense level on Count I ought to be 32, and then you

17   argue about those two prior convictions at paragraphs

18   32 and 33 which you've advised the Court today remain

19   standing as convictions in state court.

20      MR. D'AMBROSIO:  That's correct, your Honor.

21      THE COURT:  Okay.  Your paragraph number 7 of

22   your objection, you're making some kind of a double

23   jeopardy argument.

24      MR. D'AMBROSIO:  Yes, your Honor.

25      THE COURT:  I don't understand your argument.

```
 1        What do you mean?

 2             MR. D'AMBROSIO:  Essentially, your Honor, that

 3        the enhancement seeks to impose a multiple punishment.

 4        The punishment being imposed out of these predicate

 5        offenses for which he has already served time is again

 6        being imposed in this case far beyond that which he

 7        would otherwise suffer if it were not for those

 8        predicate offenses.

 9             THE COURT:  Okay.

10             MR. D'AMBROSIO:  That is essentially the

11        argument, Judge.

12             THE COURT:  Okay.  In your next objection you

13        say that, under Booker, you think that I have authority

14        to sentence outside the statutory mandatory sentence in

15        this case.  Is that your argument?

16             MR. D'AMBROSIO:  It essentially is that insofar

17        as I think one could read Booker, though it does not

18        precisely stand for this point, to impose an

19        affirmative obligation on the Government to produce

20        evidence of the prior convictions as a part of the

21        trial as well, and that was not done, to subject them

22        to a jury as well.  That's essentially what that

23        argument is.  Again, I have no case on point on that,

24        Judge.

25             THE COURT:  There's a good reason why you don't.
```

1    That's not what *Booker* says.  I don't understand your

2    objection in paragraph number 9 of your objections.

3              MR. D'AMBROSIO:  Paragraph 9 and 10 are

4    essentially extrapolations of the same argument I just

5    made to the Court, which it apparently rejects.

6              THE COURT:  And the same with paragraph 10?

7              MR. D'AMBROSIO:  Yes, your Honor please.

8              THE COURT:  Paragraph number 11, you seem to

9    concede that a collateral challenge to the underlying

10   offenses or the predicate offenses is not appropriately

11   made in this court.

12             MR. D'AMBROSIO:  Yes, Judge.

13             THE COURT:  And then in paragraph 12, what

14   you're trying to say is that the offenses listed in

15   paragraphs 32 and 33 are related offenses and so they

16   should be counted as one.  However, the probation

17   officer I think correctly points out that there were

18   different dates of the arrests and disposition.  So

19   they're not related cases under the guidelines.

20             I don't understand your claim in paragraph 13.

21             MR. D'AMBROSIO:  Paragraph 13 was just a -- was

22   a request upon the Court that the proof beyond a

23   reasonable doubt standard be applied to the prior

24   convictions of this Defendant which, again, the Court

25   had earlier rejected.

1          THE COURT:  I don't think that that's the law.

2          MR. D'AMBROSIO:  It is not.  Paragraph 13 says

3     it is not, but. . .

4          THE COURT:  And then you have an Eighth

5     Amendment argument with respect to the life term.

6          MR. D'AMBROSIO:  Yes, I do, Judge.  That's in

7     paragraph 14.

8          THE COURT:  Okay.  I'll hear the Government.

9          MS. ROGERS:  Your Honor, the Government intended

10    to call Detective Robert Enright to address the

11    sentencing guidelines.  The Government's understanding

12    is that Count II is statutorily controlled.  The

13    21 U.S.C. 851 Information enhancement has properly been

14    filed.  The Defendant is not claiming it's defective in

15    any way.  His claim appears to be that state

16    convictions might be modified or vacated.  That's not

17    the case today.  So that what we're left with really

18    is, as to Count I, the sentencing guidelines.

19          And the Government's understanding is that there

20    are basically two objections or issues that the

21    Defendant has raised, the first being his leadership

22    role, and sub issues in that are that he was directing

23    other Defendants in the drug trafficking conspiracy and

24    that his gang affiliation, that he was a leader of the

25    Latin Kings at the time he was doing this.

 1          The second issue appears to be the obstruction

 2     of justice.  And, again, the Government is prepared to

 3     put on testimony of a Providence police officer to

 4     testify regarding the Defendant's offer of 200,000 for

 5     his release on the date of his arrest.

 6          THE COURT:  I take it that you object to the

 7     Defendant's claim that the mandatory life sentence in

 8     this case is constitutionally defective.

 9          MS. ROGERS:  Yes, I do.  That's not -- there's

10     no case law holding that it's unconstitutional.

11          THE COURT:  You say that it has not been held

12     unconstitutional.  Do you have a case that says it is

13     constitutional under the Eighth Amendment?

14          MS. ROGERS:  I do not have a cite for that.  The

15     Eighth Amendment cases that I'm aware of involve the

16     death penalty.  This case is a life term of

17     imprisonment which the Defendant had the opportunity to

18     avoid, and it is constitutional under the statute.

19          THE COURT:  How did he have the opportunity to

20     avoid it?

21          MS. ROGERS:  Several offers were made prior to

22     trial, before the Information was filed.

23          THE COURT:  Okay.  Okay.  Proceed with your

24     witnesses.

25          MS. ROGERS:  The Government calls Detective

1    Robert Enright.

2              **ROBERT ENRIGHT, GOVERNMENT WITNESS, SWORN**

3              THE CLERK:  Would you please state your name and

4    spell your last name for the record.

5              THE WITNESS:  Robert M. Enright, E-N-R-I-G-H-T.

6                        **DIRECT EXAMINATION**

7    **BY MS. ROGERS**:

8    Q.  Where are you currently employed?

9    A.  I'm currently employed by the Providence Police

10   Department.

11   Q.  And how long have you been so employed?

12   A.  Approximately 16 years.

13   Q.  And were you part of the investigation that led to

14   the eventual indictment of this Defendant?

15   A.  Yes, I was.

16   Q.  On October 24th of 2004, were you working on that

17   day?

18   A.  Yes.

19   Q.  And did you have occasion to have any conversation

20   or meet with this particular Defendant on that day?

21   A.  Yes, I did.

22   Q.  What occurred?

23   A.  Mr. Francisco was transported to the rear of

24   64 Dexter Street where I was located.

25   Q.  Was he read his Miranda warnings?

1    A.   Yes.

2    Q.   And did he agree to, or did he waive those

3    warnings?

4    A.   Yes, he did.

5    Q.   And did he agree to speak with you?

6    A.   Yes.

7    Q.   Did he make any admissions at that time concerning

8    the Latin Kings?

9    A.   He stated to myself and Detective Dwyer that he was

10   a member of the Latin Kings.

11   Q.   Did you have or do you have any other evidence

12   regarding this Defendant and the Latin Kings?

13   A.   There's numerous phone calls that were intercepted

14   during the Court-ordered intercept of his phone.

15   Q.   We'll get to those in a minute, but is it fair to

16   say that you listened to every intercept with regard to

17   this Defendant's telephone in that investigation?

18   A.   Yes, I did.

19   Q.   At 64 Dexter Street, crack cocaine and powder

20   cocaine was found; is that correct?

21   A.   Yes.

22   Q.   Was there any other evidence located that was

23   related to the Latin Kings?

24   A.   Two sets of beads were seized from that apartment.

25   Q.   Showing you what's been marked Government's

1    Exhibit 1 for identification, do you recognize that?

2    A.   Yes.

3    Q.   What is it?

4    A.   These are the two separate sets of beads that were

5    seized in Joel Francisco's apartment.

6    Q.   At 64 Dexter Street?

7    A.   Yes.

8    Q.   Are you aware of the significance of those beads?

9    A.   The Latin Kings have three primary colors, black,

10   red and gold.

11   Q.   Do you know what the colors stand for?

12   A.   Black stands for the knowledge of the ancient

13   leaders of the Latin Kings, red stands for the

14   bloodshed of members of the Latin Kings, and gold is

15   symbolic more or less for prosperity.  It signifies the

16   sun shining down on the Latin Kings.

17   Q.   Have you had an opportunity to look at the two

18   different sets of beads?

19   A.   Yes.

20   Q.   And is there anything that you're aware of with

21   regard to the numbering of the beads or the pattern of

22   the beads?

23   A.   Yes.  The pattern of the beads is consistent,

24   meaning that they have to have the same amount, two

25   separate colors on a set of beads.  You can put between

1    one to five of a certain color, but next to that must

2    be the same amount of the second color.

3           In other words, on this black and red one, there

4    are three black followed by three red followed by three

5    black continuously around the whole set of beads.

6    Q.   And is that one of the rules in the Latin Kings?

7    A.   Yes.

8           MR. D'AMBROSIO:   Objection.

9           THE COURT:   Basis?

10          MR. D'AMBROSIO:   Foundation.

11          THE COURT:   Overruled on that basis.

12   Q.   Do they appear to be in substantially the same

13   condition as when they were seized on October 24th of

14   2004?

15   A.   Yes.

16          MS. ROGERS:   At this time, for purposes of this

17   hearing, I would move Government's 1 as full.

18          MR. D'AMBROSIO:   Objection.

19          THE COURT:   Basis?

20          MR. D'AMBROSIO:   Relevance.

21          THE COURT:   Overruled.   Government's 1 is full.

22          (Government's Exhibit 1 was admitted as a full

23   exhibit)

24   Q.   Now, you indicated that you listened to every

25   intercept over the wiretap of Joel Francisco's phone

1       from July of 2004 through October of 2004.  Are you

2       aware of any other co-conspirators or individuals who

3       this Defendant directed during those intercepts?

4       A.   Reynaldo Rodriguez.

5               MR. D'AMBROSIO:  Objection.  Move to strike that

6       response.  I believe the question called for a yes or

7       no response.

8               THE COURT:  Just yes or no.

9               THE WITNESS:  I'm sorry, your Honor.

10      A.   Yes, I am.

11      Q.   And were you a party to meetings where decisions

12      were made as to who to charge in this case?

13      A.   Yes.

14      Q.   Are you aware of the names of the other Defendants

15      that this Defendant directed?

16              MR. D'AMBROSIO:  Objection.

17              THE COURT:  Basis?

18              MR. D'AMBROSIO:  There must be some foundation

19      for that, I think, Judge.

20              THE COURT:  Overruled.

21      A.   Yes.

22      Q.   Who were they?

23      A.   Reynaldo Rodriguez, Miguel Jusino and Joel

24      Trinidad.

25      Q.   And in what context did he direct these

1    individuals, these three individuals?

2    A.   He would direct them by supplying them with

3    narcotics and often ordering them where to meet him,

4    what to do.

5    Q.   Were there any other individuals who he directed?

6    A.   Yes.

7    Q.   Who?

8    A.   Pedro Hernandez, William Cifredo, Juan Guerrero.

9    Q.   And in what context did he direct these

10   individuals?

11   A.   In the same manner.  He would inform them when he

12   had narcotics, where to meet him to get the narcotics

13   off him and several times what to do with the

14   narcotics.

15   Q.   Did he also have a girlfriend at the time?

16   A.   Yes, he did.

17   Q.   And did he direct her in any way in the drug

18   trafficking organization?

19   A.   Absolutely.  His girlfriend was Julissa Jaquez.

20   Q.   And what would he direct her to do?

21   A.   At times he would send some of the people I already

22   mentioned over to her house.  At a point in the

23   investigation, she was holding his narcotics.  He would

24   inform Julissa how much, what quantity of narcotics to

25   give to the suspect he was sending to her house.

1    Q.   Did he also give her any directions with regard to

2    firearms?

3              MR. D'AMBROSIO:   Objection.

4              THE COURT:   Basis?

5              MR. D'AMBROSIO:   Leading, and I don't believe

6    it's --

7              THE COURT:   I can't hear you.

8              MR. D'AMBROSIO:   It's leading.

9              THE COURT:   Sustained.   Try not to lead your

10   witness.

11   Q.   Were any documents found on October 24th, 2004?

12   A.   Yes.

13   Q.   And who did they relate to?

14   A.   Joel Francisco.

15   Q.   What were the documents, and where were they found?

16   A.   They were the charter of the Latin Kings

17   organization.   They were found at 230 Leah Street.

18   Q.   And was that where the Defendant was originally

19   arrested?

20   A.   He was arrested as he left that residence, yes.

21   Q.   And you indicated there was a charter of the

22   Latin Kings membership?

23   A.   Yes, more or less the rules and regulations.

24   Q.   Were there any intercepts that you listened to

25   during the course of this investigation where this

1    Defendant made admissions regarding whether he was the

2    leader of the Providence Latin Kings?

3         MR. D'AMBROSIO:   Objection, ask to be made more

4    specific in terms of time.

5         THE COURT:   Let's get the yes or no first, and

6    then we'll try to zero in on a time.   Just answer yes

7    or no.

8    A.   No.

9    Q.   There were no admissions by the Defendant?

10   A.   Specific admissions where he stated, "I'm the

11   leader of the Latin Kings," no.

12   Q.   Were there any conversations that you listened to

13   in the intercepts which gave you reason or the

14   Providence Police reason to believe that he was the

15   leader of the Latin Kings?

16        MR. D'AMBROSIO:   Objection.

17   A.   Yes.

18        THE COURT:   Sustained.   The answer may be

19   stricken.

20   Q.   Did the Defendant say anything else regarding his

21   arrest after he was given Miranda warnings?

22   A.   He offered to give me $200,000 to secure his

23   release.

24   Q.   And what did you do in response to that offer?

25   A.   I played it up for a few minutes, but then he just

1    forgot about it, stopped it.

2    Q.   And what do you mean you played it up?

3    A.   I told him I was interested and how could he get me

4    the money.

5    Q.   And why did you do that?

6    A.   To see what he was going to say.

7    Q.   And what did he say?

8    A.   He stated he could get $50,000 almost immediately

9    because he had known a subject who was looking for two

10   kilos of cocaine in exchange for $50,000.

11   Q.   And why did he say, or what did he want in return

12   for giving you $200,000?

13   A.   His freedom.

14   Q.   Did he indicate that he wanted to be let go or

15   expected you to let him go and not charge him?

16   A.   Yes, absolutely.

17        MS. ROGERS:   If I may have one moment, your

18   Honor.

19        THE COURT:   Take your time.

20        (Pause)

21        MS. ROGERS:   I have no further questions at this

22   time.

23        THE COURT:   Cross.

24        MR. D'AMBROSIO:   Please, your Honor.

25

**CROSS-EXAMINATION**

**BY MR. D'AMBROSIO:**

Q.   Detective, you testified the color -- Latin Kings colors are what?

A.   Black, red and gold or yellow.

Q.   And it's your testimony that these beads are related somehow to -- strike that.  Is it your testimony that these beads somehow are indicative of membership in the Latin Kings?

A.   Yes.

Q.   Because they are red, black and gold?

A.   I'm looking at the totality of the evidence.  Yes, I do.  Those beads specifically represent beads of the Latin Kings.

MR. D'AMBROSIO:  Well -- if I may approach the witness, your Honor.

Q.   Sir, can you see colors?

A.   Excuse me?

Q.   Can you see colors, sir?

A.   Yes.

Q.   You're not color blind, are you?  There's blue in there, isn't there?

A.   On one of the things there is -- I believe it's purple, actually, with the gold.

Q.   Purple.  That's not a Latin Kings color, is it?

1    A.   I'm not sure.  I named the three main colors of the

2    Latin Kings.

3    Q.   But you testified there were three colors?

4    A.   I said there were three main colors, I believe.

5    Q.   Oh, there may be more?

6    A.   It's possible.

7    Q.   Could it be you're uncertain about what colors are

8    actually indicative of the Latin Kings?

9    A.   No.  I'm positive what black, red and gold stand

10   for in the Latin Kings organization.

11   Q.   But you're not certain about blue?

12   A.   It's purple; and no, I'm not.

13   Q.   Is there any type of structure the Latin Kings use

14   in the production of their beads that you're aware of?

15   A.   I don't understand the question.  Can you repeat

16   it?

17   Q.   Well, how did you become familiar with beads in the

18   Latin Kings?

19   A.   These beads?

20   Q.   Any beads.

21   A.   Two ways.  I talked to the -- Sergeant Michael

22   Wheeler, who is the expert of the Gang Squad in

23   Providence.  He explained them to me.  Secondly, I read

24   their own charter, which is right there.

25   Q.   And when you read the charter, did it say anything

1    about blue or purple beads?

2    A.   No, I don't believe so.

3    Q.   When you read the charter, did it say anything

4    about beads?

5    A.   Yes.

6    Q.   And did it say anything about the denomination or

7    number of beads that should be on a specific rope of

8    beads?

9    A.   I believe it said between one and five, yes.

10   Q.   One and five?

11   A.   I believe that's what it says.

12   Q.   Did it talk about the number of beads being either

13   120 or 360?

14   A.   It may have.  I don't remember that part.

15   Q.   Did you count these beads?

16   A.   No, I did not.

17   Q.   So you don't know how many beads are on each

18   strand, do you?

19   A.   No.  I did not count them.

20   Q.   So you don't know whether these beads are actually

21   in conformance with the charter that you read earlier,

22   do you?

23   A.   The only thing I know is that it matches the

24   numbers sequence that it's supposed to.

25   Q.   And it kind of matches the colors?

1    A.   The black and the red definitely match the colors.

2    Q.   But the other part doesn't?

3    A.   The separate one?

4    Q.   Uh-huh.

5    A.   It has gold.  Like I stated, I don't know what

6    purple stands for.

7    Q.   Now, you mentioned a number of people, a Reynaldo

8    Rodriguez, a Mr. Jusino, Joel Trinidad, Pedro

9    Hernandez, Juan Guerrero, Julissa Jaquez.  Were you

10   involved in the investigation of all these people?

11   A.   Yes.

12   Q.   All of them?

13   A.   Yes.

14   Q.   Do you know which ones, if any, are members of the

15   Latin Kings?

16   A.   I believe so.

17   Q.   Which ones?

18   A.   Miguel Jusino, Juan Jusino, Juan Guerrero, Pedro

19   Hernandez.

20   Q.   Julissa Jaquez?

21   A.   I don't think she is.

22   Q.   And you based the determination that they were

23   members of the Latin Kings upon what, sir?

24   A.   Well, the two Jusino brothers told me they were;

25   Juan Guerrero, through the conversations with

1    Mr. Francisco and talking with the gang unit for the

2    Providence Police and the FBI.  Who was the -- Pedro

3    Hernandez was the other one?

4    Q.  I'm asking you, sir.

5    A.  Oh, on the telephone on numerous occasions he was

6    stating about being a Latin King member and reaching

7    out actually across the country talking to other Latin

8    King heads.

9    Q.  Okay.  Did he ever say that to Mr. Francisco?  Do

10   you recall a conversation that Pedro Hernandez had with

11   Mr. Francisco discussing that?

12   A.  No.

13   Q.  Do you recall a conversation between Mr. Guerrero

14   and Mr. Francisco discussing membership in the Latin

15   Kings?

16   A.  There's one phone call where Mr. Francisco more or

17   less yells at Mr. Guerrero because Mr. Guerrero allowed

18   his girlfriend to answer the telephone, breaking a rule

19   of the Latin Kings.

20   Q.  Did he say, You're breaking a rule of the Latin

21   Kings?

22   A.  Absolutely.  He said, You know that's a rule, and

23   she's not allowed to answer your phone.

24   Q.  When was that conversation, sir?

25   A.  I don't have the exact date, but I believe it was

1    in September.

2    Q.  Did you ever hear any conversations between

3    Mr. Jusino and Mr. Trinidad and the Defendant?

4    A.  Can you break them up for me?

5    Q.  Did you ever hear any conversation between

6    Mr. Jusino and the Defendant discussing the Latin

7    Kings?

8         THE COURT:  Which Mr. Jusino?

9         MR. D'AMBROSIO:  Miguel Jusino.

10   A.  Not that I can recall.

11   Q.  Do you ever recall any conversation between the

12   Defendant and Mr. Trinidad discussing the Latin Kings?

13   A.  There's numerous, and I mean numerous,

14   conversations between Mr. Trinidad and Mr. Francisco

15   where Mr. Trinidad is arguing with Mr. Francisco.  The

16   specific incident I can go over with you if you want.

17   Q.  Well, do you recall any dates or times for these

18   conversations?

19   A.  Oh, one is definitely in October, probably the week

20   before the end of the investigation.

21   Q.  How many conversations do you recall Mr. Francisco

22   discussing the Latin Kings?

23   A.  I'd say over a dozen.

24   Q.  Twelve conversations?

25   A.  Approximately.

1    Q.   How many conversations were actually listened to or

2    intercepted?

3    A.   On just Mr. Francisco's line?  I'm not sure of the

4    exact number, but I'll take a guess, 12,000, 13,000.

5    Q.   Twelve, thirteen thousand?

6    A.   Approximately.

7    Q.   So would it be fair to say, then, out of every

8    1,000 conversations on Mr. Francisco's line, the Latin

9    Kings may or may not have been directly or indirectly

10   referenced?  Is that a fair statement?

11   A.   Yes.

12   Q.   And would it also be a fair statement that in those

13   12,000 or 13,000 conversations, Mr. Francisco never

14   came out and said to anyone, "I'm not a member of the

15   Latin Kings," or, "I am a member of the Latin Kings"?

16   A.   He never stated either one of those things.

17   Q.   So when you testified that he is a member, you were

18   surmising that; correct?

19   A.   No.  Once again, I'm going by the totality of all

20   the evidence.

21   Q.   And that was the evidence you testified to here

22   today; correct?

23   A.   And actually the Defendant told me he was a member

24   of the Latin Kings.

25   Q.   You mentioned some documents that were seized at

1    Leah Street?

2    A.   Yes.

3    Q.   Do you know how old those documents were?

4    A.   No.

5    Q.   What room in Leah Street from which -- strike that.

6    What room at Leah Street where -- I'm sorry.  I

7    apologize.  From what room at Leah Street were they

8    seized?

9    A.   I'm not sure.  I didn't seize them, and I wasn't at

10    230 Leah Street.

11    Q.   Any of these documents have the Defendant's name on

12    them?

13    A.   There's a lot of documents there.  Some of them do

14    have his name on them, yes.

15    Q.   Can you tell us which ones?

16    A.   No.

17        MR. D'AMBROSIO:  One minute, please, your Honor.

18        (Pause)

19    Q.   With respect to those beads again, those are two

20    separate strands, aren't they?

21    A.   Two separate sets of beads, yes.

22        MR. D'AMBROSIO:  Thank you.  Nothing further,

23    your Honor.

24        THE COURT:  Any redirect?

25

1                  **REDIRECT EXAMINATION**

2   **BY MS. ROGERS:**

3   Q.  Was Reynaldo Rodriguez also a member or admitted

4   member of the Latin Kings?

5   A.  Yes.

6   Q.  And he was one of the individuals you referenced

7   earlier?

8   A.  Yes.

9   Q.  And you mentioned on cross-examination that there

10   was a specific conversation that you recalled between

11   the Defendant regarding Latin Kings that occurred in

12   October?

13   A.  Yes, I believe so.

14   Q.  What was that conversation?

15   A.  He was speaking with Mr. Trinidad.  Apparently the

16   night before there had been an argument at a house

17   where numerous Latin Kings were gathered and

18   Mr. Francisco shot one of the suspects in the knee with

19   a gun.  Mr. Trinidad called up Mr. Francisco yelling at

20   him about the incident.  Mr. Trinidad kept saying, How

21   could you do that to one of us?  He's one of us.  He's

22   willing to bust a cap with you.  He's one of us.  He

23   just kept stating that to him, and he couldn't believe

24   that Mr. Francisco would shoot the subject over just

25   arguing, joking around.

1       MR. D'AMBROSIO:  Objection.  Move to strike the

2  latter part of that response.

3       THE COURT:  On what basis?

4       MR. D'AMBROSIO:  I believe it far exceeds the

5  question that was asked.  It became narrative at a

6  certain point, Judge.

7       THE COURT:  Overruled.

8  Q.  Did you listen to any conversations -- strike that.

9  Were any documents seized with regard to the Latin

10  Kings changing some of their rules on how they would

11  communicate to avoid detection by law enforcement?

12  A.  Can you repeat that?

13  Q.  Are you aware of any evidence in this case where

14  the Latin Kings, after trials took place, changed

15  certain methods of communicating or following rules to

16  avoid detection?

17  A.  Yes.

18       MR. D'AMBROSIO:  Objection.

19       THE COURT:  Just a minute.  Sustained.  The

20  answer may be stricken.

21  Q.  Now, the cross-examination included questions with

22  regard to only one, perhaps, in a thousand phone calls

23  referencing the Latin Kings.  In this case --

24       THE COURT:  Ms. Rogers, quite honestly, I have

25  to tell you, and I don't know, Mr. D'Ambrosio as well,

1    this isn't a racketeering case.  This isn't a case

2    brought under the Street Gangs Act.  Whether or not the

3    Defendant has an affiliation is something that the

4    Bureau of Prisons is going to be concerned about, but

5    it certainly doesn't affect his guideline range.

6              MS. ROGERS:  Then I'll stop asking questions.

7              THE COURT:  So I don't know why we're going down

8    that road.  It doesn't affect the guidelines sentence

9    in this case.

10             MS. ROGERS:  The Government has no further

11   questions.

12             THE COURT:  Do you have any follow-up?

13             MR. D'AMBROSIO:  Are you aware the Defendant --

14   I'll withdraw it.  Nothing further, Judge.

15             THE COURT:  Okay.  Step down.

16             THE WITNESS:  Thank you, your Honor.

17             THE COURT:  Does the Government have any other

18   witnesses?

19             MS. ROGERS:  No, your Honor.

20             THE COURT:  Okay.  Does the defense wish to put

21   on any witnesses?

22             MR. D'AMBROSIO:  No, your Honor.

23             THE COURT:  Okay.  I'll hear the Government.

24             MS. ROGERS:  Are you looking for argument or the

25   sentencing recommendation based on the testimony?

1          THE COURT:  At this point just argument on the

2     impact of the testimony you've presented as it relates

3     to the objections raised by the Defendant to the

4     pre-sentence report.

5          MS. ROGERS:  As stated earlier, the Government's

6     view on the Defendant's objections basically distill

7     down to two, the first being leadership role.

8          Detective Enright has testified that this

9     Defendant directed five or more other Defendants, five

10     of which were Latin King members, and had them either

11     store drugs, narcotics for him, supplied them with

12     narcotics or told them where to go; and in this sense,

13     that burden has been met, the leadership role has been

14     met.

15          With regard to the gang affiliation, as the

16     Court has pointed out, whether he's actually a member

17     of the Latin Kings is a decision for the Bureau of

18     Prisons.  However, the evidence is that there were

19     other members of Latin Kings and that he was directing

20     them, which in this context a reasonable inference is

21     that he was the head of the Latin Kings in the

22     Providence area at the time of his arrest.

23          The Defendant also admitted to being a member of

24     the Latin Kings.  And Government's Exhibit 1, there are

25     two sets of beads, one gold and purple, the other red

1    and black, and the Detective testified that the red and

2    black is without a doubt in his mind significant of

3    Latin King membership.  It matches the colors of the

4    Latin Kings, red and black; and the beads are in the

5    correct sequence and numbering, three beads of each

6    color in sequence.

7         The second issue is obstruction of justice.  The

8    detective testified that on the day of his arrest, the

9    Defendant offered the Providence Police $200,000 for

10   his arrest.  Again, the Government believes that this

11   testimony was adduced at trial; but at this point the

12   officer has testified again, and the Government's

13   argument is the same as probation's, that this

14   constitutes obstruction of justice where he offered in

15   order to obstruct the investigation of the case and his

16   arrest by seeking release basically by bribing or

17   attempting to bribe the Providence Police.

18        MR. D'AMBROSIO:  Your Honor, may it please the

19   Court, I don't recall any testimony elicited this

20   morning which would lead the Court to believe that this

21   Defendant had any more than a passing affiliation with

22   the Latin Kings, let alone being a leader or organizer

23   of the Latin Kings.

24        The testimony offered was, again, that out of

25   thousands of conversations, there may have been some

1    with -- that either alluded to or the name Latin King

2    may have been represented.

3         However, when specifically asked whether this

4    Defendant stated he was a member of the Latin Kings or

5    denied being in that membership, the detective could

6    not recall but did specifically deny being a leader.

7    There was no testimony as to him being a leader.

8         The Government offers its exhibit, a series of

9    beads which actually are inconsistent with the

10   detective's own testimony as to the colors affiliated

11   with the Latin Kings.

12        Moreover, your Honor, the Government sought or

13   alluded to, through the testimony of the witness, as to

14   certain documents seized, as to certain charters, rules

15   and regulations seized.  These documents, the detective

16   could not state from where they were seized, the date

17   or remoteness in time of the seizure or when the

18   documents were produced.  And most significantly of

19   all, your Honor, these documents were not introduced

20   into evidence for the Court's perusal or consideration.

21        What the Court has left to consider is the

22   testimony of the detective which the Defendant would

23   posit is, at best, equivocal in terms of the

24   affiliation of the Defendant with the Latin Kings and,

25   moreover, is downright contrary to any assumption of

 1          leadership by the Defendant within that organization.

 2              For all those reasons, we ask that that

 3      enhancement be denied to the Government.

 4              THE COURT:  What enhancement?

 5              MR. D'AMBROSIO:  I am -- the adjustment.  I'm

 6      sorry, Judge, the finding of --

 7              THE COURT:  The adjustment for an aggravating

 8      role --

 9              MR. D'AMBROSIO:  The adjustment for an

10      aggravating role.

11              THE COURT:  -- is not dependent upon whether or

12      not he's affiliated with a gang.

13              MR. D'AMBROSIO:  I understand that, Judge.

14              THE COURT:  That adjustment is made pursuant to

15      the number of other individuals who were involved in

16      the drug trafficking activity.  Do you want to address

17      that?

18              MR. D'AMBROSIO:  In terms of the drug

19      trafficking activity, in terms of the individuals

20      indicated, the Court should note that there was no one

21      overall Indictment of these individuals.

22              The Government offered a series of Indictments

23      for the Court's consideration, again, Indictments

24      pertaining with little evidentiary value.  However, the

25      named affiliations of these individuals in terms of

1    whether this Defendant exercised control is, again,

2    speculative.

3        The Defendant may have had affiliations with

4    other people, but whether he was exercising them within

5    a leadership hierarchy or position of authority, again,

6    the evidence is bereft in that respect.  There may have

7    been a series of -- excuse me, a series of individual

8    actions, but whether these were all coordinated or

9    whether they were set up in such a manner as to place

10   the Defendant in a leadership posture, again, I would

11   posit is speculative at best.

12       And for all these reasons, we refer to our

13   objections previously filed, Judge.  Thank you.

14       THE COURT:  Do you want to talk about

15   obstruction?

16       MR. D'AMBROSIO:  Judge, I think -- the basis for

17   the objection to the pre-sentence report was because I

18   had believed -- I did not recall hearing that testimony

19   at trial.  It may have been offered.  Based on that

20   testimony, I did not cross-examine on that particular

21   ground.

22       All I would say, again, is that it was not

23   brought before the jury.  It's being brought before the

24   Court today.  I would argue that it should have been

25   brought before the jury if that enhancement is being

1     sought.   Other than that, I have no further objection.

2          THE COURT:   Ms. Rogers, I have a question for

3     you with respect to this particular Indictment and the

4     inclusion of the four-level increase for an aggravating

5     role as it pertains to Count I.   Count I of this

6     Indictment names this Defendant alone.

7          MS. ROGERS:   Yes.

8          THE COURT:   And charges him with knowingly and

9     intentionally possessing with intent to distribute the

10    500 grams or more of cocaine.

11         The guideline talks about his role in that

12    offense.   There's not a conspiracy charged.   There are

13    not Co-Defendants charged in that particular count of

14    the Indictment.   So I guess what I'm asking you is, how

15    do we assign him a leadership role in an offense where

16    he is the only person charged?

17         The Government, it seems to me, and

18    Mr. D'Ambrosio makes the point, did not indict all of

19    these individuals together.   The Government saw fit --

20    in fact, in Mr. Francisco's case, he's got three others

21    pending where he's named with other individuals, and

22    those matters are scheduled to be tried; but this is

23    one Indictment charging him with one date in October of

24    2004 with possessing in excess of 500 grams of cocaine.

25         MS. ROGERS:   The Government --

1          THE COURT:   So how do you include the five

2    others?

3          MS. ROGERS:   The Government did not indict in an

4    overarching conspiracy because of the wheel-and-spoke

5    conspiracy case law where the Government admits it

6    would have had difficulty proving that the other

7    co-conspirators that surrounded this Defendant were

8    aware of each other and were working in concert with

9    each other.

10          However, the Government's position is still that

11    the evidence shows this Defendant directed each of the

12    co-conspirators individually and that he is chargeable

13    or held accountable under the relevant conduct portion

14    of the United States Sentencing Guidelines where this

15    particular case that went to trial involved a large sum

16    of crack cocaine and a significant sum of cocaine.  He

17    clearly was involved --

18          THE COURT:   Those were the seizures that were

19    made on October 24th?

20          MS. ROGERS:   Yes, and the evidence at trial

21    showed that he was in the business of distributing that

22    cocaine, crack and powder, throughout the term of the

23    wiretap, which encompassed July through October of

24    2004.

25          THE COURT:   Okay.

1        MS. ROGERS:  And all of the Indictments involved

2    activity that occurred in that same time period and

3    involved conversations or part of the proof --

4        THE COURT:  I understand that this was part of a

5    wiretap investigation and that there were a number of

6    other people, and I've sentenced a number of other

7    people who were heard on those wiretaps in conversation

8    with this Defendant.

9        But the concern that I have is that in the

10    vehicle that you've used here, he's got one offense on

11    one date.  And what you're saying to me, I guess, is

12    that looking at the relevant conduct, I take into

13    account all of the other individuals, and that's how

14    the enhancement applies.

15        MS. ROGERS:  That's the Government's position.

16        THE COURT:  Did you want to address that

17    further?

18        MR. D'AMBROSIO:  No, your Honor.

19        THE COURT:  Okay.  I'll rule on each of the

20    Defendant's objections as they relate to the guidelines

21    calculations with respect to Count I starting with his

22    first one, that is, that the indication in the

23    pre-sentence report that the cases of William Cifredo,

24    David Batista and Miguel Jusino are related cases.  As

25    I said, that one does not affect the guidelines range

1    at all.

2         With respect to the second objection, and that

3    is as to whether or not the Defendant admitted that he

4    was a member of the Latin Kings, we have heard now the

5    testimony of Officer Enright who has testified here

6    today under oath that on the date of the Defendant's

7    arrest, he admitted to Officer Enright that he was a

8    member of the Latin Kings organization.  And so I find

9    that testimony to be both credible and undisputed in

10   this case.

11        As to whether or not this Defendant was the

12   leader or not the leader, I don't know whether he was

13   or he wasn't; but he certainly has admitted that he was

14   a member of that organization, and so the reference to

15   his affiliation that is contained in the pre-sentence

16   report shall stand.

17        With respect to the two-level increase that the

18   probation officer included for obstruction of justice

19   pursuant to 3C1.1 of the guidelines, again, Officer

20   Enright testified here today that on the date of his

21   arrest, this Defendant offered a substantial sum of

22   money to the arresting officer to let him go.

23        The Defendant named the number of $200,000 and

24   told Officer Enright that he had $50,000 of it in

25   earnest money if the officer would permit him to leave,

1    thereby giving him an opportunity to flee.

2         And under the guideline, certainly the

3    Defendant's attempt to bribe the arresting officer

4    would have obstructed or impeded the administration of

5    justice during the investigation and prosecution of

6    this Defendant, and so that two-level increase I find

7    was properly added.

8         With respect to the four-level increase included

9    by the probation officer at paragraph number 17, that

10   four-level increase was added pursuant to Guideline

11   3B1.1, which is entitled "Aggravating Role."  And it

12   says that based on the Defendant's role in the offense,

13   that the Court should increase the offense level

14   pursuant to subsection (a).  If the Defendant was an

15   organizer or leader of a criminal activity that

16   involved five or more participants or was otherwise

17   extensive, then his offense level should be increased

18   by four levels.

19        And the application note goes on to define who

20   is a participant, and it includes a person who is

21   criminally responsible for the commission of the

22   offense but need not have been convicted.

23        Application Note 2 says that to qualify for this

24   adjustment, the Defendant must have been the organizer,

25   leader or manager of one or more participants; and here

1   the Court has heard testimony that this Defendant gave

2   direction to at least five other individuals who were

3   also engaged in drug distribution.

4        Officer Enright has testified to having listened

5   in on conversations that this Defendant had with at

6   least five other individuals where he would tell those

7   individuals where the drugs were stored, how to access

8   them and where to make deliveries or where to make

9   pick-ups, as the case may be.

10       The probation officer, as I said, included this

11  enhancement because it appeared from the prosecution

12  version that this Defendant had control over other

13  individuals in the course of his drug dealing activity.

14       I find that the enhancement was properly

15  assessed against the Defendant given the fact that

16  there were at least five other individuals with whom he

17  was conversing over the telephone, who were receiving

18  direction from him in the same activity that he stands

19  convicted of here in Count I, and that is the

20  possession with intent to distribute in excess of

21  500 grams of cocaine.  So the offense level was

22  properly determined to be 38 for the offense in

23  Count I.

24       The Defendant has correctly pointed out that in

25  *United States v. Booker*, the Supreme Court has directed

1    sentencing Courts to look at the guidelines in an

2    advisory capacity.  All of his arguments with respect

3    to a requirement under *Booker* that the Court has to

4    make these determinations pursuant to a -- the standard

5    of beyond a reasonable doubt or that these

6    determinations should have been made by a jury I think

7    have been addressed in *Booker*.

8         The Supreme Court in finding that the guidelines

9    were advisory dispensed with the notion that those

10   sorts of sentencing enhancements would have to be found

11   by a jury beyond a reasonable doubt, and so the Court

12   has made those determinations here today under the

13   lesser standard of preponderance of the evidence in

14   accordance with *Booker*.

15        In this case, the guidelines calculation is

16   almost academic.  This Defendant, by virtue of two

17   prior convictions and the Government's filing of a

18   sentencing enhancement Information pursuant to Title 21

19   of the United States Code, Section 851, and his

20   conviction on Count II of the Indictment, is subject to

21   a mandatory life sentence.

22        And so I'll hear the Government now on sentence.

23        MS. ROGERS:  As to Count I, under the

24   guidelines, the Government is recommending a 360-month

25   term imprisonment, which is the low end of the

 1    guidelines.   There is a mandatory $100 special

 2    assessment, and the Government is recommending the

 3    eight years' supervised release.  Again, as the Court

 4    has pointed out, it is probably academic.

 5         As to Count II, by statute, the Government is

 6    recommending the mandatory life term imprisonment.

 7    There is no term of supervised release imposed on a

 8    life imprisonment sentence.  However, the $100 special

 9    assessment is mandatory for a total of $200.

10         Probation has reviewed this Defendant's

11    finances, and it does not appear that he has the

12    financial wherewithal to pay a fine; and where he is

13    facing lifetime incarceration, a fine would be also

14    academic.  So the Government is not recommending that a

15    fine be imposed.

16         THE COURT:  Mr. D'Ambrosio.

17         MR. D'AMBROSIO:  Yes, your Honor.  With respect

18    to Count I, the Defendant would ask that this Court

19    impose a sentence at the low end of the guidelines or

20    even below it if the Court would deem fit in view of

21    the rather serious ramifications that are attended to

22    imposition of sentence at Count II.

23         Again, the term of supervised release as such,

24    again, may or may not be a moot point; but, again, we

25    would ask for the lowest possible term under that

1     statute -- under the appropriate guideline.

2          Your Honor, with respect to Count II, the

3     Defendant would renew his objection to the imposition

4     of sentence in that term for the reasons set forth in

5     his earlier memorandum, that the sentence sought to be

6     imposed is grossly disproportionate to the criminality,

7     the criminal culpability of this Defendant and his

8     prior offenses.

9          The record should reflect that this Defendant

10    was -- possessed a small amount of cocaine, both simple

11    possession charges, in state court seven or eight years

12    ago; and those two prior predicate offenses converted

13    what would have been, while a lengthy sentence, into a

14    lifetime -- into a potential lifetime imprisonment

15    situation.

16         It seems, out of a basic sense of fairness or

17    justice, that Congress could not have actually

18    importuned to create this situation.  It appears to be

19    one where, although the statute speaks of felony drug

20    offenses, it strikes the Defendant as particularly odd

21    that while these two prior offenses were state

22    felonies, they may have been federal misdemeanors under

23    the analogue federal provision.

24         Again, we would just ask this Court to consider

25    the proportionality of the sentence to be imposed on

1    Count II and if the Court were to find that the penalty

2    authorized by statute cannot pass constitutional

3    muster.  Thank you, your Honor.

4         THE COURT:  Mr. Francisco, before I impose

5    sentence, is there anything you would like to say?

6         MR. D'AMBROSIO:  Your Honor, I've discussed this

7    with the Defendant.  Insofar as he still has three

8    pending cases, he determined that he does not wish to

9    make any statements to the Court today.  Is that

10   correct?

11        THE DEFENDANT:  Yes.

12        THE COURT:  You're waiving your right of

13   allocution?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Mr. Francisco, this is an incredibly

16   impossible situation.  You are a highly intelligent

17   individual.  You come from a family that is intact.

18   Are those all your family members back there?

19        THE DEFENDANT:  Yes, your Honor.

20        THE COURT:  They're hard-working people who

21   tried to show you how to live a law-abiding life.  They

22   still care about you.  They're here.  Even knowing what

23   sentence I have to impose today, they're here.  That's

24   something that most Defendants who stand where you are

25   on the day of sentencing don't have.  Most people who

1    come through here are here because they don't -- they

2    didn't have a family that cared about them and so they

3    turned to the streets.

4         I don't know what it is that made you turn to

5    the streets.  I don't know why, after going through the

6    Ocean Tides program, that you didn't turn it around.

7    That was a good program.  You got your GED there or you

8    got your high school diploma there?

9         THE DEFENDANT:  High school diploma.

10        THE COURT:  You got a high school diploma.

11   You're no dummy.  You even started college.  What a

12   waste.  What a waste.

13        The guidelines in this case, as Mr. D'Ambrosio

14   has said, and I'm talking now about Count I because

15   Count I is controlled by the guidelines, even Count I,

16   frankly, the guideline sentence is a sentence that I

17   would not impose.

18        The low end of that guideline range calls for a

19   sentence of 30 years.  The most amount of time you ever

20   got in state court, and most of the sentence was

21   suspended, was 20 years.  So under *Booker*, I would not

22   be inclined to follow the guidelines.

23        Section 3553 talks about a sentence that is --

24   that the sentence imposed should be sufficient, but not

25   longer than necessary, to accomplish the goals of

1    sentencing, which here are to punish, to deter, that

2    is, to keep you and others from committing the same

3    kinds of offenses, and at the same time to keep you

4    from doing what you were doing, protect the public from

5    you because you're a public health menace.  You're out

6    there purveying poison.

7         The sentence also has to promote respect for the

8    law.  And when I see a guideline range that starts at

9    30 years and goes to life, I really start to wonder

10   whether that sentence would promote respect for the law

11   because it has to make sense even to you.

12        And so I have to say that 360 months, which is

13   based essentially on the types of drugs involved here,

14   but I think it's universally thought by those of us who

15   are in the sentencing business that to base a sentence

16   on an artificial factor like the amount of drugs

17   involved just doesn't make sense, that what we really

18   ought to be doing is looking at the offender, and

19   you're no angel.

20        I'm saying this to you, Mr. Francisco, because I

21   don't know what will happen.  I assume you're going to

22   take an appeal, and I would encourage you to do so.  I

23   don't know what's going to happen; but if by some

24   chance you end up getting out, I would hope that you

25   take what I say here today to heart because you have

1    the ability to turn it around, you have the ability to

2    fly straight, you have the ability to be a productive

3    member of society if you just turn around and do what

4    the people who are sitting in the back of the courtroom

5    have been telling you to do for the past 10 years while

6    you've been trying to be a tough guy out there on the

7    streets.

8            And so the sentence that I would impose that I

9    think is more than adequate to accomplish the factors

10   that are set forth in 3553, that I think does promote

11   respect for the law, is a sentence of 180 months on

12   Count I.  And I say that, as I said, because you have

13   to see some light at the end of the tunnel, and a

14   sentence of 180 months does just that.

15           It stops you from selling drugs, so it protects

16   the public from you.  It will maybe ring home to you

17   that you can't do this, and at the same time it will

18   punish you; but it also leaves open, like I said, that

19   light at the end of the tunnel so that you can make up

20   your mind while you're in prison serving that sentence

21   to clean up your act, get yourself some job training so

22   that when you get out you can be a productive member of

23   society.

24           That's the sentence I would impose.  I have to

25   impose the $100 special assessment on that count, and I

1    would impose a sentence of five years of supervised

2    release with respect to Count I.  I guess it calls for

3    not less than eight.  Is that right, Barry?

4         THE PROBATION OFFICER:  Yes, your Honor.

5         THE COURT:  So I have to impose the eight years

6    of supervised release on Count I.  The problem,

7    Mr. Francisco, is that Count II.  This is not my

8    sentence.  This is the sentence of Congress.  This was

9    a sentence that was decided before you committed the

10   offense.

11        This was a sentence, in effect, that you gave

12   yourself by doing two things, one, committing the

13   offense and, two, forcing the Government to file the

14   enhancement.  So in a sense you chose the life

15   sentence, and I don't know whether you regret that

16   today or not.  I suspect you do.  But whatever

17   motivated you to take that path, you'll have to

18   reconcile that in your own mind.

19        And so with respect to Count II, in accordance

20   with the law, I must impose a sentence of life

21   imprisonment.  I must also impose the $100 special

22   assessment.  I impose no fine on either count since I

23   find the Defendant does not have the ability to pay a

24   fine, and I impose no supervised release on Count II

25   because of the life term.

1        Now, Mr. Francisco, you have a right to appeal

2   the sentence I've imposed.  As I said, I would

3   encourage you to file an appeal.  I don't know whether

4   you're going to prevail on appeal.  Your lawyer here

5   has argued that the mandatory life sentence is a

6   violation of your constitutional rights.

7        Unfortunately for you, the case law up until now

8   does not support that claim; but you have nothing to

9   lose at this point, and so I would suggest that you

10  file your appeal.

11       If you cannot afford an attorney to file that

12  appeal for you, you should advise the Court, and

13  counsel will be appointed.  Do you understand that?

14       THE DEFENDANT:  Yes, your Honor.

15       THE COURT:  You also have only 10 days from

16  today within which to file that Notice of Appeal.  If

17  you fail to file the Notice of Appeal within 10 days,

18  you will have lost your right to take an appeal.  Do

19  you understand that?

20       THE DEFENDANT:  Yes, your Honor.

21       THE COURT:  Mr. Francisco, I don't know what

22  else to tell you.  As I said, the sentence that I've

23  had to impose here today I have had to impose because I

24  swore an oath to uphold the law, and I swore that oath

25  to uphold the law whether I agree with the law or not.

1    I do not make the law.

2        But you got the sentence that the law requires

3    today, as I said, by virtue of the choices you made in

4    this case and the choices you made in your life.

5        Anything further from the Government?

6        MS. ROGERS:  No, your Honor.

7        THE COURT:  Counsel?

8        MR. D'AMBROSIO:  Your Honor, would the Court

9    consider a recommendation to the Bureau of Prisons that

10   the Defendant be kept in custody in the northeastern

11   United States?

12       THE COURT:  Well, I'll make a recommendation

13   that he be placed in a facility that is near Rhode

14   Island so that he may maintain contact with his family.

15       MR. D'AMBROSIO:  Thank you, your Honor.

16       THE COURT:  That's the best I can do.  I'd like

17   to see counsel in chambers.

18       (Adjourned)

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4          I, Karen M. Zinni, RPR-RMR-CRR, do hereby

5  certify that the foregoing pages are a true and

6  accurate transcription of my stenographic notes in the

7  above-entitled case.

8

9

10

11  _____

12  Karen M. Zinni, RPR-RMR-CRR

13

14

15

16

17  _____11-16-05_____

18  Date

19

20

21

22

23

24

25